LLC. Argument not to be received. 15-5. Mr. Luckett, please come to the podium. Okay, Mr. Luckett. Okay, police to the court. My name is Ben Luckett, and I represent the opponent, Sierra Club. I'd like to reserve four minutes of my time for rebuttal. ICG Hazard's Thunder Ridge coal mine is discharging toxic pollutant selenium at harmful levels. ICG's unauthorized selenium pollution exceeds state water quality standards that are set at levels necessary to protect wildlife. The discharges violate Kentucky's State Surface Mining Act standard and the Clean Water Act. ICG claims that authorization under a general Clean Water Act permit that places no limitation on selenium, and was issued without any meaningful consideration of the potential for selenium pollution, shields it not only from liability under the Clean Water Act, but also liability under the independent obligations imposed by its Kentucky State Surface Mining Program. ICG is wrong. I'll first explain how ICG's discharges violate Kentucky's enforceable State Surface Mining Standards, then I'll discuss how they violate the Clean Water Act. ICG's selenium discharges violate Kentucky's State Surface Mining Standards that were promulgated pursuant to the federal SMCRA, regardless of whether they also violate the Clean Water Act. Now, neither ICG nor any other party challenged those unambiguous requirements when they were approved by both the Federal Office of the Surface Mining and the U.S. EPA as consistent with the Clean Water Act. ICG's expectation... Who issued those, the surface mining selenium standards? Which agency issued those standards? Those standards were promulgated by the state of Kentucky and pursuant to the federal SMCRA. And those standards... Is this the same agency of the state that deals with the Clean Water Act as well? Is this a state environmental agency that deals with surface mining and deals with the Clean Water Act as well? They are within the same cabinet, yes, Your Honor. The agency that issued these standards was the Department of Natural Resources, I believe. And the plain language of Kentucky's state standards clearly require that a discharger must at all times comply with both the effluent limits in a Clean Water Act permit and with state water quality standards. As the Southern District of West Virginia found in Sierra Club v. Palatin, those surface mining standards are independent obligations, independent from any requirements under the Clean Water Act. There is a savings clause, maybe that's somewhat ambiguous, that seems to say, according to the defendants here, seems to say that if the pollutant is not a violation of the Clean Water Act, it's not a violation of the surface mining standards too, right? You have an argument about that. ICG's reading of that savings clause would render completely meaningless the unambiguous portion of Kentucky's standards that require compliance with water quality standards. Now those performance standards, the surface mining standards, do not violate the savings clause for two primary reasons. First, the Clean Water Act, as well as the Surface Mining Act, clearly requires compliance with water quality standards. The issuance of any permit is prohibited unless it can assure compliance with water quality standards. Now the Clean Water Act seeks to ensure that compliance through the issuance of NPDES permits. The surface mining standards at issue here merely provide an additional mechanism to ensure compliance with state water quality standards. As the Office of Surface Mining explained... The first thing we've got to figure out in this case is the analytical framework that applies to it, and more specifically whether we're going to apply, say for example, the four circuit test articulated in Pining Run to this general permit situation, and whether that's the appropriate approach or not. And I'd like to hear you, maybe you're getting there, but I'd like to hear you address that in some detail. The US EPA has interpreted the Clean Water Act permit shield in Section 402K, which is what the Pining Run case deals with. And it set out two separate interpretations, one for individual permits and one for general permits, which is at issue here. Now when general permits are issued, they do not have the same detailed disclosures of the nature of the discharge, and thus they're not as well able to develop effluent limitations to protect the environment. In the absence of some guidance other than what a case like Pining Run gives us, are we just going to pluck out of the air the analytical framework? The guidance is provided by EPA in a 1995 memo, where it says that the pollutants that are provided a shield under a general permit are only those within the specified scope of the permit. Are you referring to, and I'm not sure, because I'm fuzzy on what it's called, but are you referring to the policy statement that predates both Ketchikan and Pining Run? Yes, Your Honor, I'm referring to the policy statement that was applied. How do we know that the EPA still thinks that that has anything whatever to do with this situation? It's never said anything to the contrary, Your Honor. But that's not very strong affirmative evidence that the EPA thinks it has anything to do with this situation today, does it? There's nothing that would indicate that EPA has taken a different position. Now, even under the reasonable contemplation, the Pining Run standard, that was adopted in Ketchikan Pulp, a formal adjudication, even under that standard that applies to individual permits, the discharges at issue here would not be shielded. At the time that the Kentucky Division of Water issued the permit, they had not considered a single point of selenium discharge data, had never looked at a discharge of selenium from a coal mine. But they had issued rules in a statement that dealt with chronic and acute selenium pollutants. Had they not? I can see that you can say, well, they hadn't contemplated selenium discharge except with regard to these standards that they published for, I guess, mining. But if they published standards, it's hard to say they didn't contemplate selenium standards, isn't it? You follow what I'm saying? Yes, I believe so, Your Honor. The Kentucky Division of Water had never, at the time it issued the permit, never reviewed any evidence of selenium discharges. So you're saying they're separate organizations, and the Water Division had not contemplated the selenium standards that were issued with regard to coal mines issued by another board or something, right? Your Honor, no agency in Kentucky has ever imposed selenium limits on any coal mine. Well, what about putting that aside and taking, I think, the same point Judge Merritt was getting to, but approaching it a little bit differently. Let's say we did say that the Piney Run test was appropriate for this situation, and I know you disagree that that would be appropriate. But let's say we did. What would be within the reasonable contemplation of an agency? We're not talking about what the agency actually contemplated. I mean, the language is reasonable contemplation. Isn't that more of an objective standard? I believe the reasonable contemplation standard absolutely requires that the agency contemplate the discharges issued. Well, that would be actual contemplation, wouldn't it? Not reasonable contemplation. I believe, Your Honor, that reasonable contemplation places an additional requirement beyond simply what would be an actual contemplation. If you're right that they had to contemplate it, and then, as you're arguing, the contemplation had to be reasonable under the second part of the Piney Run test, you seem to be saying, at least reading between the lines, that they actually had to study each and every potential pollutant coming out of a mine in order to satisfy the contemplation test. Just out of curiosity, in your experience, how many potential contaminants are there from these mines, in theory? Is it tens? Is it hundreds? Is it thousands? There are many. I can't say the number, but there's a relatively limited number that have the potential to be discharged in harmful amounts. Whatever that limited number is, would we be in the ballpark if we said dozens? A dozen. To be reasonably contemplated in your mind, then they actually had to do a specific study of that dozen or so in order to then be able to say we reasonably contemplated it, right? Yes, in order to provide... What's the purpose of a general permit? The general permit offers...  It does not allow the same consideration of the threats to the environment that a detailed application under an individual permit offers. And thus, the shield under a general permit is not as broad as that offered under an individual permit. ICG easily could have sought an individual permit for its coal mine. And indeed, in most states, all coal mine permits are issued as individual permits. If it wished to obtain the broader shield available to individual permittees, it could have chosen that route. It could have disclosed... And had Kentucky been concerned about the adverse impact of a general permit, then they could have simply required them to get an individual permit, right? When they got the notice. That's correct, but the contemplation... And they didn't do that. The notice only came after the issuance of the general permit. The contemplation that Piney Run looks at is the contemplation before the permit was issued. Piney Run says that because the permitting scheme is dependent upon the permitting authority being able to judge the threat posed by the discharge, discharge is not within the reasonable contemplation of the agency. So you argue that the agency had to do the contemplation both at the time the general permit was issued and at the time that they notified the agency that they were going to use that general permit for a specific mine? No, we believe it would be at the time the general permit was issued. And at that time... At the outset and not subsequently. At the outset, because ICG's mine was automatically reauthorized with the issuance of the general permit. That constituted an issuance of a permit to ICG. And at that time, it was clear that the agency had not considered the potential for selenium pollution that would allow it to judge the threat posed to the environment and institute proper effluent limitations to control that threat. Now, even if ICG's discharges are shielded... Have you concluded the answer to that question? I believe so, yes. Do we have further questions at this time? You'll have your rebuttal time, Mr. Luckett. Thank you, Congress. If it pleases the Court, my name is Bob McCluskey. I'm here on behalf of ICG. In response to questions about the scope of the permit shield posed by the Court, I believe Judge McKeague was right that the result that would be yielded by the Sierra Club's argument is that a general permit would provide virtually no protection to a permitting. Your position is that it would provide absolute protection for everything that's not mentioned in the permit, right? Everything that's considered part of coal mining, Your Honor. There are circumstances one could imagine that might not be covered. For example, a worker showing up with paint thinner in the back of his pickup truck... According to your submission, the coal mine could, for example, discharge huge amounts of arsenic if it's not mentioned in the permit or any other pollutant, and they would be protected by the general permit. As much as I hate to admit it in those terms, yes, Your Honor. And that's exactly what EPA said back in 1979. Well, the EPA has got this interpretation, I guess it is, that says EPA's position is that general permits authorize the discharge of all pollutants within the quote, specific scope of a particular general permit subject to all pollutant limits, notification requirements, and other conditions. Now, that's hard to interpret, but whatever it means, that's EPA's position, right? It is, Your Honor, and I think if you look at... You have two documents here that are probably of some relevance. One is the 1995 EPA policy on the permit shield that was discussed earlier. It has three components to it, three different ways one can fit within the permit shield. The third of those, which is not discussed in Piney Run or any of the others, the third is whether a pollutant is not identified in a permit application in any way, but is a constituent of a waste stream operation or process identified in the permit process. That is the definition of a general permit. If you go to 40 CFR 122.28, which defines what a general permit is, a general permit is issued for categories of discharges within a geographic area of sources involving similar types of operations with discharges the same types of waste. That's not consistent with this statement by EPA that says subject to all pollutant limits, right? I believe it is, Your Honor. The pollutant limits are those which are actually effluent limits imposed in the general permit. You're subject to those as well, but to the extent there is not... If the general permit does not have anything in it that limits pollutants discharged, then your submission is that they can discharge anything that they want to, arsenic, selenium, oil, whatever. There are limits in this general permit for some substances. There are not limits in this general permit for selenium. There are limits. Subject to limits are the limits that are expressly set within that permit. That language refers only to what is in the permit, not any other limit. This is your position. I'm not saying this is a fact. It's a question. The limits that are in the permit, not limits set outside the permit by statute or regulation. I believe that's correct, Your Honor. I'm trying to figure out whether there are temporal aspects of this as well. If you're operating under a general permit, that has to be renewed, does it not? Individual permits and general permits alike have to be renewed every five years. This permit was issued in August 1st of 2009, will expire July 31st of 2014. I got it. I'm not suggesting that this is or is not good policy from a national or state standpoint, but I'm just wondering whether the way in which discovery after a mine has operated that the effluent has something that exceeds certain limits, when those limits are not expressed in the general permit, then gets caught immediately or whether the whole system envisions that at the time of renewal, if in the meantime this is what experience has shown at that point, the renewal then will condition those effluent limits in this case. Presumably this will be the subject of great debate on the renewal of the permit, but let me say also... Does it come down here to a fight between the Sierra Club and the mining industry as to whether that fight occurs as soon as the effluents are discovered or at the time of the renewal? Is that really what we're talking about here? In a sense, and only for pre-existing mines. Understand that this particular general permit divides the world into mines which already existed, that is places where water just falls and it's going to come off regardless, but the land's been disturbed, and new or expanded discharges. For the existing discharges, which is what we have in this case, it requires a one-time sample for 13 different pollutants, including selenium, but not at the outset of the permit. For a new or expanded discharge, it does require representative sampling at the outset, and if there's a trigger there, the state can deal with it in that context. So there is, in this general permit, a procedure to deal with new discharges in a different way than for existing discharges. How many times has the general permit been issued to this particular coal mine? This mine has been under the general permit since 1991, and I don't know when the general permit was first issued and renewed, but it's been renewed several times under the general permit in Kentucky. They didn't start testing for selenium until... Who started testing? The mine itself? Your Honor, in this case, yes. Long story, I've been with the Sierra Club on the other side of this for many years, but selenium was generally not known to be present at the levels we find it until about 10 years ago in central Appalachia, largely because the test methods used were probably not sensitive enough to pick it up at the levels that are imposed by the standards. So selenium was largely not known, even though it was probably been there for many, many decades. What does that say about the reasonable contemplation issue if we were to apply the Piney Run test? Well, I think in this case, the facts are, regardless of whether it's reasonable or not, they did contemplate or understand... So you believe it's actual contemplation, too? I don't believe that's a test for a general permit. But if we were going to apply that test, you think that we should look only at what evidence there is in the record that the Kentucky agency actually contemplated the presence of selenium? I don't think that's necessarily the case, but I don't think you have to worry about it here because it's clear the agency did contemplate the presence of selenium here. Well, suppose we don't think that's all that evident from the evidence. Well, then I think you can still say, based on the USGS report, that there was reasonable contemplation of it. And I'll read you a quote. The Sierra Club itself cited this USGS report that the Kentucky Division of Water relied on. Sierra Club, in a separate petition to EPA, said that that document could easily be used to predict water quality exceedances for selenium in Kentucky. The reason I'm asking this, it might not seem so apparent, is it seems to me that if you decide to apply a pining run to this general permit situation, it doesn't exactly fit as well here as it does with an individual permit situation. But assume you decide that that's the best guidance we've got. When you get to the reasonable contemplation prong, it seems to me that with a general permit, the inquiry about contemplation might appropriately be a more generalized inquiry and that you might focus a little more on what the agency would reasonably have contemplated than what it actually did in a particular case. I mean, it just seems to me, I mean, that's the language, and it just seems to me that more general evidence arguably could suffice. I believe that's true, Your Honor. That's pretty much what the district court judge said, I think. Well, and that might be why the district court sort of really didn't, when he got to the point of actual contemplation, he wasn't really doing a faithful application of pining run, but that's sort of what his mental process might have been. Because pining run was an individual permit where the applicant was obligated to find materials and submit them. The third prong, again, of the EPA test, not discussed in pining run or in in-ray Ketchikan, is if the pollutant's not identified, but is a constituent of an operation generally understood. Now, the reasonable contemplation in that context would be whether there was a general understanding of pollutants coming from a mine. There's a more general inquiry, and the general permit does anticipate that the agency will take the lead in determining the scope of all of the things that might come off of a surface mine. I realize that you don't like the concept of the two-part pining run test applying to general permits, but if we were to hold that it does and then we get to reasonable contemplation, whatever that means, the district judge never got to that. So it seems to me we have two choices. We then make that determination ourselves as to what the agency did or did not reasonably contemplate, or we remand it to let the district judge take a look at and then apply the second part of the test. Which do you advocate in that situation? The Sierra Club, if I recall correctly, advocated having this court decide that. We did not take issue with that. We said that this court probably could because it's a record review case essentially, but we didn't take a strong position that you couldn't or shouldn't remand it to the district court to make that determination. There are stacks of things back there that require some looking at to reach that conclusion. I think we've briefed it. Sierra Club has briefed it too. Either one's okay. I believe either one's okay. I believe we prevail in either case. There is one point I'd like to make on the surface mining side of things if I could very briefly. The claim here that the Sierra Club can somehow, if there's no claim under the Clean Water Act, there is no claim under the Clean Water Act, they concede to enforce water quality standards that have not been reduced to an effluent limit. They concede that in their briefs. What they seek to do is to take a surface mining provision which adopts a Clean Water Act standard, that is water quality standards. Water quality standards are adopted under the Clean Water Act, not under SMACRA, and they seek to enforce that water quality standard in a way that the Clean Water Act doesn't permit because there's not an effluent limit here imposed on salinia. What do you mean it doesn't permit it under the general permit? We don't know what it permits under a specific individual permit. Well, there is, let me back up, the citizen supervision of the Clean Water Act allows enforcement of effluent limits. Effluent limits includes an unpermitted discharge. It does not include water quality standards, if that makes sense. So their SMACRA claim is they're trying to enforce the water quality standard of five parts per billion itself. It's clear the Clean Water Act will not allow them to do that. They concede that. They're trying to use SMACRA as a backdoor to do that. They're trying to do it in a way that's fundamentally at odds with the Clean Water Act. Now they make an argument, in addition to this conflict, that the conflict doesn't exist where there is a state surface mining rule. And I want to clarify, I think there's a fairly easy way to explain this. The claim they have brought under the citizen suit provision of SMACRA says it's an action to enforce the Federal Surface Mining Act for the violation of a rule or permit issued pursuant to the Federal Surface Mining Act. So for the purpose of this action, the state rule, surface mining rule, on which they rely, is considered issued under the Federal Surface Mining Act and thereby subject to the provision in the Surface Mining Act that you can't use that act to modify or supersede the Clean Water Act. They're between a rock and a hard place here. If the state surface mining rule is not considered issued pursuant to SMACRA, then in the Third Circuit case, Haydoe v. Merkle says there's no jurisdiction to even bring the claim. So they either have to concede that state rule is issued pursuant to the Surface Mining Act and thereby subject to its restrictions, or if it's not issued pursuant to the Surface Mining Act, they never had a claim in the first place. Well, it seems to me to be unrealistic to say that under the general permit, you can have as much pollution as you want. The mining company can have as much pollution as it wants to have or does have for a whole host of chemicals or metals, selenium, arsenic, this, that, or the other, unless the permit itself prohibits it. It doesn't seem... I mean, that just leaves the environment wide open to pollution. Your Honor, we disagree. That's really a challenge to the general permit, the way it was written, and that's really the problem the Sierra Club has here. They didn't challenge the way this general permit was renewed in 2009. They could have done that, and they might do it again in 2014, whatever the contours of that permit are. This isn't some permanent situation where selenium could be discharged in perpetuity at levels in excess of the water quality standards. State's free to modify the permit. The permit will be renewed in eight months, presumably these issues will be addressed in that context. So there isn't some mechanism set in place here to authorize... But you can do it as long as the permit is in existence there beforehand. If it's five years, then you can... For five years, you can dump into the water all of the arsenic, all of whatever it is you want to, without any remedy. Well, not necessarily true. They have a remedy against the state agency. They can suggest that the state agency has an obligation to impose limits on this permit. They don't have a remedy directly against us for a violation of an effluent limit, though. That's true. I see my time is up. I'm happy to answer any other questions. Otherwise, we urge you to please affirm the district court. Mr. Lockett. ICG's counsel states that the general permit authorizes unlimited discharges of any pollutant, not specifically limited, in that general permit. And as Your Honor stated, that could include arsenic, mercury, selenium, any of these pollutants. We're not talking about whether this is a good idea or a bad idea. We're talking about what are, if any, the limitations on citizen suit provisions. It's not to say that this can't be regulated, as the mine counsel indicated, by the state. Now, you may be unhappy with the extent of state regulation, but we're talking about where the private right of action is, aren't we? Yes, Your Honor. And that action is for any discharge that's not authorized by a permit. So, obviously, Congress anticipated there would be some limitation on private rights of action, or they wouldn't have put in a permit shield, and there wouldn't be a savings clause in SMACRA. Is that correct? The savings clause in SMACRA does not in any way reference the citizen suit provision of SMACRA. And, indeed, the savings clause... No, but it's what prevents your... What your opposing counsel said was your backdoor attempt to win under that act if you can't win under the Clean Water Act. Yes, Your Honor. What the savings clause says is that nothing in the act... The Surface Mining Act should be interpreted as modifying or repealing the Clean Water Act, as well as nine other different federal statutes. And here it's clear that the surface mining standards do not modify or repeal that act. Congress put in place a mechanism by which... Back to the private remedy or citizen suit provision here to address Judge Merritt's legitimate concern, obviously, about some sort of unlimited discharges for a whole five years of arsenic and selenium and other bad things. It's not as if there's no environmental remedy here by somebody, right? It's just a question of whether you can enforce it. Yes, Your Honor, and the Clean Water Act authorizes... So what's going on with the state, in your view, not taking their own action if this is such cataclysmic consequences as you suggest? I believe that's a failure of the state agency. And Congress explicitly recognized that that was a potential. And they stated in the legislative history of the Clean Water Act that's why they included the citizen suit. So when did you learn about the potential for selenium discharges? This organization has worked with selenium discharges in West Virginia for a very long time. It's more recently... So why was there no discussion about this in the renewal in 2009? In 2009... You knew that the general permits had been issued without selenium limitations. You knew that it was up for renewal in 2009, and you knew about selenium. Your Honor, I don't think there's anything in the record to show what Sierra Club knew or did not know in 2009. And the record before the agency... I thought you just said that. Maybe I misunderstood you. In West Virginia, Your Honor, they were very active on this issue. Now, what they had to go on was what the record before the agency when it issued the permit. And when it issued the permit, the agency had not looked at a single piece of selenium discharge data. They didn't mention the word selenium in their response to comments. They said EPA requires us to include a one-time metals monitoring. That's all they said. There was no reason for Sierra Club or any other person to challenge the failure to include selenium limits because they did not believe that the permit authorized the discharge of selenium. Counselor, let me ask you this. I think I've asked it before, but I don't have it clearly in mind. Which agency of the state government, if it was an agency of the state government, issued or published the selenium chronic and acute standards? Those are standards that apply generally to water bodies. And that was issued by the Kentucky Division of Water, the same agency that issued the general permit. And now that permit is enforced by the Kentucky Division of Mining that also enforces the mining permits at issue here. And those mining permits clearly require compliance not only with the effluent limitations issued under a Clean Water Act permit, but also with state water quality standards. Well, if the State Water Quality Standards Board or agency of the state issued selenium standards for chronic and acute selenium, how can we say that they didn't contemplate the problem here? Those are issued not with respect to any particular discharger. EPA sets recommended standards and then the state adopts those. Does reasonable contemplation mean this particular entity that is permitted or does it mean a higher level of general awareness of the substance and the notion that it should not exist in unlimited quantities in effluents? The reasonable contemplation refers to the specific discharges that are being authorized by the permit. And so that is when we're talking about reasonable contemplation. What was within the reasonable contemplation of the agency when they were issuing this permit for these specific discharges? And what do you base what you just said on? Because either you're wanting it to be that way or is there something we can look at that tells us that? That's what the Fourth Circuit said in Piney Run, is that the agency looks at the discharges that they are authorizing, judges their threat to the environment. And they're functioning in an individual permit setting. That's what the court in Piney Run is talking about. If we follow that test in a general permit setting, it's natural to think that there would have to be some thought given to how the test fits into this situation. And the fit is just not very good when you get to this part of the issue. Well, that's why we believe that... I understand. But if you do apply Piney Run here, you've got to make them fit. And what you just said makes sense in the individual permit situation but doesn't necessarily make sense here. So is there anything else other than Piney Run, which is an individual permit case, that would tell us what to do? We think that a more limited scope should apply. But if to general permits, precisely because they're authorizing discharges from facilities all over the state, from a wide range, and that would have a wider range of discharges. But going back and following up on Judge Merritt's question to you, if the state has issued selenium limitations, and they clearly have, and if you measure reasonable contemplation,  how can you say that the possible discharge of selenium wasn't contemplated when the state had specific limitations on the amount of a discharge? Your Honor, the state has never placed a selenium limitation on a discharge from a coal mine. It's never done that. They haven't placed it in a general permit. Nor in any individual permit. But our question isn't whether they've placed it in it. Our question is whether they contemplated it. So here we know they knew about selenium, correct, in general. There's not much in the record at the time the permit was issued. There are selenium limitations, not in the permit, but in the state clean water rules, right? There are levels of selenium, water quality standards, which apply generally to the water body. And we're talking water here. So they knew about selenium. They knew it can occur in water. And they had dealt with it in state regulation. So whether that's adequate or not is a whole different question. But how can you say, gee, they didn't know anything about this. It wasn't reasonably contemplated. What the reasonable contemplation refers to is whether they reasonably contemplated that the specific discharges that they're authorizing, in this case, all those coal mines that would fall under the general permit, would or would not discharge that pollutant. And here, there's nothing to show that they reasonably contemplated. And so to do that, they had to have done a study of each potential pollutant back to where it was before. Or else, if they didn't, it wasn't reasonably contemplated. That's your bottom line, isn't it? That they must do something that would allow them to judge the threat posed to the environment, as the Fourth Circuit said in Piney Run. Do they have to do that every five years? Actually, although the permit says that it will be renewed every five years, that hasn't been the case in the past. And as the general permit guidance that's in the record shows, the general permit need not be renewed. So in fact, this could authorize unlimited discharges of selenium, mercury, arsenic in perpetuity. If the general permit isn't renewed, how do they keep surface mining? Because under the Administrative Procedures Act, they are automatically allowed to continue discharging under their existing permit, under the existing general permit, even if the permit's not renewed. Well, I hate to prolong this, but tell me this. Did the state agency in Kentucky simply pick up language from some EPA regulations or some other regulation somewhere and put it into the Kentucky regulation? Water quality standards, yes, Your Honor, were adopted from EPA's recommended standards, and they are indeed required to have them. And what you're saying is they didn't really do any study, they just copied them. Is that what you're saying? Yes. At the time the Division of Water issued the general permit, there's no evidence in the record to show that they had ever looked at the discharge of selenium from a coal mine. But they did copy it from the EPA. They've got it in there, they got it from somewhere, so apparently they copied it, right? The general water quality standards that apply to all water bodies and any dischargers, coal mine or not. Well, now, is that significant on the contemplation point that they simply copied it, didn't do a study, just put it in there or not? It is certainly significant that they had never reviewed any selenium discharge data or any other selenium information with specific references to discharges from coal mines prior to issuing the general permit. And those state standards, the water quality standards, are made enforceable by the surface mining permit. All right. Anything else? All right. We thank you both for your argument. We'll consider the case carefully.